## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**TERESA BOYD,**                                  **CASE NO.**

     **Plaintiff,**

**v.**

**LOUIS DEJOY, POSTMASTER**
**GENERAL OF UNITED STATES**
**POSTAL SERVICE, SOUTHERN**
**AREA,**

     **Defendant.**

_____/

## COMPLAINT

Plaintiff, TERESA BOYD, hereby sues Defendant, LOUIS DEJOY

POSTMASTER GENERAL, UNITED STATES POSTAL SERVICE, and alleges:

## JURISDICTION

1.      This is an action brought under Title VII of the Civil Rights Act of

1964, codified at 42 U.S.C. §2000e et seq. and 42 U.S.C. §1981, under the

Rehabilitation Act, codified at 29 U.S.C. §794 et seq and 42 U.S.C. §1981a, and

under the Age Discrimination in Employment Act (ADEA), codified at 29 U.S.C.

§621 et seq. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331

(federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights claim jurisdiction).

Attorneys' fees and costs are also sought under 28 U.S.C. §2412.

2.     This is an action involving claims which are, individually, in excess of Seventy- Five Thousand Dollars.

## **THE PARTIES**

3.     At all times pertinent hereto, Plaintiff, TERESA BOYD, has been a resident of the State of Florida and employed by Defendant.  Plaintiff is a member of a protected class because of her race, actual or perceived disability and/or record of impairment, age, and because she reported unlawful employment practices and has been retaliated against thereafter.

4.     At all times pertinent hereto, Defendant, LOUIS DEJOY POSTMASTER GENERAL, UNITED STATES POSTAL SERVICE, has been organized and existing under the laws of the United States.  At all times pertinent to this action, Defendant has been an "employer" as that term is used under the applicable laws identified above.  Defendant is Plaintiff's employer as it relates to these claims.

5.     At all times pertinent hereto, Defendant, LOUIS DEJOY, in his Official Capacity as the POSTMASTER GENERAL of the UNITED STATES, has been organized and existing under the laws of the United States.  At all times pertinent to this action, Defendant has been an "employer" as that term is used under the applicable laws identified above.  Defendant is Plaintiff's employer as it relates to these claims.

2

## CONDITIONS PRECEDENT

6.    Plaintiff has satisfied all conditions precedent to bringing this action.

## STATEMENT OF THE ULTIMATE FACTS

7.    Plaintiff began her employment with Defendant in 1999 and, at all times pertinent to this action, has worked as a Letter Carrier and Union President at Defendant's United States Postal Service Lake Jackson facility, in Tallahassee, Florida.

8.    Plaintiff has been and continues to be subjected to disparate treatment, different terms and conditions of employment, and held to a different standard because of her race, gender, age, actual or perceived disability and/or record of impairment, and has been retaliated against after reporting discrimination and utilizing administrative processes at her disposal as an employee of the Defendant. This disparate treatment was effectuated by individuals including but limited to, MPOO Paul Steele, Manager Matthew Stanley, MPOO Reeves, Postmaster Camille Moscola-Calvo, Manager Daniel Becker, Manager Vanessa Cobb, Manager Sammayyah Rattley, Postmaster Hilton Beatly, Supervisor Waylon Morrison, Manager Ed Miller (Former Postmaster)

9.    Plaintiff was injured in or around 2015 and 2016 requiring work restrictions that limited her ability to carry items that weighed twenty-five pounds

or more which constitutes roughly 3% of Plaintiff's total Letter Carrier duties for mail preparation and distribution.

10.     Plaintiff was out on Worker's Compensation leave from October 2016 to November 17, 2017. During her worker's compensation leave, Plaintiff was assigned a claims examiner named Kathy Ballard.

11.     Plaintiff had learned from Examiner Ballard that the Worker's Compensation nurse that Plaintiff was assigned had communications with the Postmaster at the time, Ed Miller. Plaintiff also learned that Postmaster Miller really did not want Plaintiff to return to work following her worker's compensation leave.

12.     While Plaintiff was recovering, she reached a crucial diagnostic stage and her physician recommended that she see a specialist who focused on hand injuries. Plaintiff pursued a referral through Examiner Ballard but for some unknown reason Examiner Ballard appeared to be attempting to fulfill the wishes of Postmaster Miller by obstructing and delaying Plaintiff's access to the specialist she needed.

13.     To return to work, Plaintiff needed to achieve maximum medical improvement and a form (CA-17) completed reflecting that she would be cleared for work eight plus (8+) hours a day. Examiner Ballard's effort to delay Plaintiff's access to the specialist she needed in turn delayed her ability to obtain maximum medical improvement and the form she needed. On information and belief, Examiner

4

Ballard intentionally delayed Plaintiff's access to a specialist to impede her ability to obtain maximum medical improvement and return to work at the behest of Postmaster Miller due at least in part to her disability and other protected characteristics. Plaintiff was delayed from December 2016 to February 2017.

14.    If Plaintiff had not been subject to the delay sought by Ed Miller, Plaintiff could have returned to work much sooner.

15.    In March 2017, Plaintiff received a CA-17 from by her Worker's Compensation physician clearing her to return work on full duty. However, Defendant would not allow Plaintiff to return because it claimed that they had no work available within her medical restriction. This was the Defendant's position until November of 2017.

16.    Sometime between March and November of 2017, an unknown party informed the Office of Inspector General that Plaintiff would not return to work which resulted in an investigation against her. The truth, however, was that management was not allowing Plaintiff to return to work even though they were obligated to do so as part of their agreement with the union of which Plaintiff was a member.

17.    During this period where Defendant refused to allow Plaintiff to work under the false charge against her, Plaintiff was aware that Letter Carriers were working overtime and managers within her postal facility were also engaged in mail

5

delivery. Further, Defendant should have been and was apprised of Plaintiff's capacity to engage in at the very least limited duty labor due to the report provided by her CA-17 clearing her to work as far back as March of 2017. This indicated to the Plaintiff that Defendant was lying when they stated that there was no work available for her and were discriminating against her as a black female over the age of 58 and based on her disability.

18.    Plaintiff also maintains that her prior EEO activity motivated the Defendant's actions against her.  Over the years of Plaintiff's employment with Defendant, she represented and assisted multiples of employees file and prosecute EEO complaints involving Defendant, a fact known to the supervisors/managers identified above.

19.    At the time that Plaintiff was attempting to return to work to assist reduce the overtime, in jobs that were not only available but that Plaintiff was qualified to perform, she was also aware that a Letter Carrier named John Cobb was working on limited duty at this time for a knee injury. Plaintiff had requested limited duty too but had been denied.  Plaintiff was qualified for at the very least, answering telephones and clerking tasks pending her required surgery. Defendant was obligated to make such accommodations not only under the laws applicable to this action but also based on the union agreement.

20.     Defendant finally relented and permitted Plaintiff to work again at full time duty starting in November of 2017.

21.     Throughout the remainder of 2017 to 2019, Plaintiff started to notice members of management acting adversely towards her. While these incidents did not involve any official adverse employment action, Plaintiff realized she had to keep her guard up as it became clear that management did not want her in the workplace.

22.     Plaintiff's employment plummeted downwards on September 26, 2019 when Defendant unjustly placed Plaintiff on Emergency Placement. A female employee named Valerie Joiner (a black female), spoke with Supervisor Morrison (a white male) to request her time documents. Supervisor Morrison refused and falsely claimed that he could not provide them to her. Ms. Joiner then approached Plaintiff for assistance. Plaintiff came to assist Ms. Joiner with her pursuit of her time documents. Supervisor Morrison continued to refuse even though Ms. Joiner was entitled to the documents. Supervisor Waylon ordered Plaintiff to go back to her Case. Plaintiff complied and went to her Case where she began speaking to another female employee named f/n/u Garcia. Supervisor Morrison then approached Plaintiff at her Case post and began to interject into the conversation about being on Worker's Compensation status as though Plaintiff was talking to him. Plaintiff asked

Supervisor Morrison whether he would want to get paid when he took time off and that is when Supervisor Morrison ordered Plaintiff to get off the clock.

23.     Plaintiff was later sent home on emergency placement based on this incident. Plaintiff contested her emergency placement and obtained a ruling in her favor at a grievance hearing. The grievance hearing officer for this incident indicated that Defendant lacked the justification necessary to warrant applying emergency placement status to Plaintiff.

24.     Sometime around October 22, 2019 Defendant began a route count process to assess Letter Carriers route times, speed, and efficiency.  Other employees within Plaintiff's workplace had experienced route counts before and were fearful that they would result in another reduction in routes therefore increasing the workload of Letter Carriers during shifts.

25.     During this period, at some point on October 22, 2019, Plaintiff went to Supervisor Morrison's office to retrieve information from him and slammed his hand down on the papers as she attempted to pick them up from his desk. Plaintiff was verbally accosted by a Supervisor Morrison who demanded her to get off the clock.

26.     Following this incident, Plaintiff was put on emergency placement under nefarious and unjust pretenses by the Defendant for the second time. A letter

certifying the emergency placement was provided to Plaintiff on October 23, 2019. Plaintiff again contested the emergency placement at a grievance hearing.

27.     During the grievance proceedings, Defendant's supervisor alleged that Plaintiff was the violent party in the interaction and snatched papers from Supervisor Morrison's desk. However, Plaintiff once again received a favorable ruling, and the grievance hearing officer ruled that Defendant lacked just cause to put Plaintiff on emergency placement.

28.     Despite the ruling however, Plaintiff was placed on a 14-day suspension later on November 14, 2019 for the same reasons alleged for her emergency placement on October 23, 2019. The suspension documentation contained additional allegations against Plaintiff indicating she allegedly violated postal service standards of conduct, engaged in workplace harassment, and engaged in actions without diligence. Plaintiff once again filed a grievance and following the hearing, the grievance hearing officer once again ruled in her favor indicating for a third time that management lacked just cause to impose a fourteen (14) day suspension as discipline. This grievance went to Step B and a decision was filed and dated January 9, 2020.

29.     Beginning on or around October 26, 2019, Defendant told Plaintiff that it did not have work available to her within her medical restriction. Defendant's claim was false since Plaintiff's medical restrictions only covered lifting items 25lbs

9

or more. Plaintiff had this same restriction as far back as 2015 and was permitted to work with a limited duty accommodation which she had been receiving since her return in November of 2017. This restriction was only applicable to three percent (3%) of her duties as a Letter Carrier. Packages heavier than 25 lbs were rare and her medical restriction had little to no impact on her ability to deliver mail lighter than 25lbs which constituted the other 97% of her duties.

30.     Following October 26, 2019, Plaintiff was aware that both managers and rural carriers were delivering city mail. This let Plaintiff know that Defendant had mail that she could have been delivering for compensation. Further, Defendant was aware through the 2017 CA-17 that Plaintiff was able to deliver mail for eight plus (8+) hours each week per doctor's orders.  Defendant has deprived Plaintiff of work hours from October 26, 2019 to present.

31.     Plaintiff thereafter filed a grievance regarding the alleged lack of work available due to her medical restriction. Even after a ruling in her favor, Defendant is currently only offering Plaintiff the unreasonable accommodation of one and a half hours (1.5) of work per day five (5) days a week. In the entire year of 2020, Plaintiff only earned a little over $5,000.00.

32.     Restricting Plaintiff to only working one and a half hours (1.5) per day is unreasonable for two reasons. First, the Department of Labor and the United States Postal Service recognizes a reasonable accommodation for a position to cover 4

10

hours of labor per day, not 1.5 hours per day. Plaintiff's Union and Defendant's management have a mutual agreement subscribing both parties to the Department of Labor's Employee Relations Manual. That document places specific obligations regarding Injury Compensation and guidelines for modifying an employee's job assignments in Chapter 540 and other relevant sections. Per that document, Defendant is obligated to provide an employee returning from injury, like Plaintiff, a "suitable job offer". A suitable job offer is at the bare minimum 4 hours per day. A suitable job offer is equivalent to a reasonable accommodation. Second, Defendant was spending more money paying overtime to the remaining Letter Carriers whose workloads were increased by her absence than Defendant would have paid by allowing Plaintiff to work 40 hours a week for compensation.

33. Plaintiff is aware that supervisory staff of Defendant have the resources and skill to reassign mail weighting above a specific weight if they choose, allowing the Plaintiff to work 100% of the time only with mail within her medical restriction. This reassignment process would have been a more tenable reasonable accommodation that would fall in line with the employment manual both the union and management agreed upon. Nonetheless, Defendant continues to refuse to provide this accommodation to Plaintiff.

34. In an effort to return to limited duty full time work status, Plaintiff repeatedly filed new CA-17 paperwork indicating that she was cleared to work.

11

During the 2017-2019 time period and to date, Defendant could have provided Plaintiff a reasonable accommodation for work including diverting weighted mail away from her delivery schedules. Plaintiff was still denied work. On information and believe, the CA-17 documents provided to Plaintiff by the Defendant were given to her with errors imbedded in them to make them invalid.

35.    On information and belief, Defendant's continued refusal to return Plaintiff to her full-time work schedule was partly motivated by comments on her CA-17 indicating that Plaintiff would likely work slower due to her age.

36.    On information and belief, Defendant's refusal to return plaintiff to full time status was motivated by her race, age, disability or perceived disability and the fact that she previously assisted other employees in filing charges of discrimination and reported discrimination.

37.    On May 15, 2020, Plaintiff was outside in the parking lot speaking with her daughter when she was approached by MPOO Steele. Plaintiff was returning to the lobby of the Lake Jackson Post Office to retrieve her things she left when MPOO Steele began to verbally accost Plaintiff with questions. Plaintiff was off the clock at this time and indicated as such throughout her brief time in the facility to retrieve her personal effects. MPOO Steele followed and repeatedly asked Plaintiff where her car was parked. Plaintiff refused to answer and requested that MPOO Steele

leave her alone because she was off the clock. The harassment was so bad that Plaintiff ultimately ran to her car to get away from MPOO Steele.

38.   Plaintiff was not suspended or put on emergency placement on May 15, 2020.

39.   The parking lot issue continued on May 21, 2020 when Vanessa Cobb (who at this time was a manager), Manager Rattley, and MPOO Steele exited the Lake Jackson Post Office and approached the Plaintiff about where she had parked her car, which was in the front of the building. Plaintiff has worked for the United States Postal Service and the Lake Jackson Post Office for 22 years and had never been reprimanded for parking in the front of the building. Manager Cobb, Manager Rattley, and MPOO Steele harassed Plaintiff regarding her choice of a parking space. Manager Cobb verbally accosted the Plaintiff and yelled in the presence of Manager Rattley and MPOO Steele. Manager Cobb alleged Plaintiff was not parking in the employee parking lot. Plaintiff attempted to voice her own defense by arguing that other employees were permitted to park in the front parking spaces where her car was parked as Plaintiff had parked in that area of the facility for 22 years. Manager Cobb's erratic and unprofessional behavior in front of MPOO Steele was tacitly approved by him as he never once intervened to calm down Manager Cobb. Plaintiff felt unsafe returning to work.

40.     On May 22, 2020, Plaintiff arrived at work on time and saw that her timecard was missing from the facility. Plaintiff then attempted to resolve the situation but later learned that she was put on emergency placement again. This was the fourth time Plaintiff was put on emergency placement. MPOO Steele falsely alleged that he instructed Plaintiff to only park in the employee parking area, which was not true. This emergency placement was in violation of Articles, 5, 10, 16, and 19 of the National Agreement in which Defendant is a party too.

41.     Records reflect that MPOO Steele falsely alleged on June 1, 2020 that Plaintiff had engaged in violent/threatening behavior against management. MPOO Steele alleged that Plaintiff yelled, flailed her arms wildly while pacing the floor, and waved her arms rushing quickly between Manager Cobb and Manager Rattley, none of which was true. MPOO Steele also falsely alleged that Managers Cobb and Rattley were intimidated by this alleged behavior.

42.     MPOO Steele's false report mirrors stereotypical racial and gender tropes from the 1800's that were reimagined in films produced in the 1930's and 1940's. Tropes painting black women as erratic, uncontrollable, and intimidating whenever they engaged in any sort of expression or resistance to stressful situations and mistreatment.

43.     The hypocrisy of MPOO Steele's allegations provides an example of textbook disparate treatment by Defendant. Plaintiff is aware of two incidents of

actual intimidating behavior and actual policy violations within the workplace on the part of white male employees. Plaintiff is also aware of an incident involving a black female employee who engaged in what was allegedly similar behavior and received severe reprimand the two white male employees were never given.

44.     The first incident involved Aaron Jett (a white male). Mr. Jett became angry during a shift and threw a pile of mail into the air in front of Postmaster Reeves. This was a terminable offense and at the very least should have lead to an emergency placement. However, what makes MPOO Steele's allegations against Plaintiff so incredible is that Mr. Jett threw the mail, cursed out members of management, clocked out without a supervisor's approval, and on his way out was begged to not leave. Once outside, Mr. Jett punched a pole outside of the facility. He never received a formal emergency placement and was permitted to return to work the next day.

45.     The second incident involved Ted Dumer (a white male) who openly cussed out Station Manager Matthew Staley. Instead of being told to clock out on the spot, Manager Staley spoke with Mr. Dumer in his office. Mr. Dumer calmed down briefly only to curse at management a second time. Manager Staley attempted to resolve the situation again and brought Mr. Dumer a water bottle as penance. Neither of the men involved in these respective incidents were put on emergency placement or suspension.

15

46.     Another example of disparate treatment by Defendant comes from the reprimand of a black female employee named Jessica McCarthy. Ms. McCarthy was alleged to have balled up her fist at Supervisor Morrison. Almost immediately, Ms. McCarthy was a recipient of a notice of removal. Per an agreement, Ms. McCarthy agreed a notice of warning if she admitted she balled her fists.  The swiftness of the supervisors of the Defendant reprimanding black female employees in comparison to their white male counterparts is a textbook indicate of disparate treatment.

47.     It is worth noting that Plaintiff is substantially smaller is stature and weight when compared to Manager Cobb, Manager Rattley, and MPOO Steele, respectively. The notion that she was threatening to any of these three individuals is incredulous.

48.     At the time of the suspension, Defendant was already aware of Plaintiff's repeated use of grievance filings and Equal Employment Opportunity activity to protect herself and fight back against the disparate treatment within her workplace. Following her May 22, 2020 emergency placement, Plaintiff once again engaged in the grievance process which rose to Step B level. Once again, management and the union agreed that Defendant lacked just cause to put her on emergency placement. The Step B Decision was provided on July 9, 2020, and July 30, 2020.

16

49.     Following the Step B decision published on July 9, 2020, Plaintiff was issued a Notice of Removal on July 13, 2020 by Station Manager Ed Miller (Former Postmaster and MPOO who was demoted). The Notice of Removal was issued based on the false allegations asserted by MPOO Steele regarding the May 22, 2020 incident for which a Step B grievance panel already concluded that the lesser reprimand of emergency placement lacked just cause.

50.     Once again, Plaintiff would contest adverse employment action by filing a grievance against the Notice of Removal decision by Defendant.   In Plaintiff's grievances and/or EEO filings, she also claimed that she was the victim of discrimination based on her race, disability, reprisal and/or ago.

51.     On September 28, 2020, Plaintiff attempted to enter the Westside Station Postal Facility to deliver union mail to Union Secretary Miller as a favor. Plaintiff was met by Supervisor Robert Bator who told her that a directive was issued by Tallahassee Area Postmaster, Moscola-Calvo, prohibiting Plaintiff from entering any other post offices in the Tallahassee Area.

52.     On information and belief, Plaintiff was the only employee out of over two hundred (200) postal service workers in the Tallahassee srea prohibited from entering post office facilities within the city.

53.     On December 5, 2020, Plaintiff was informed by Meagan Barber that Postmaster Becker required Plaintiff to obtain medical clearance before she could

return to work and/or come on Postal premises. Plaintiff had already repeatedly filed valid CA-17's indicating she was fit to work back in 2017 and 2019, respectively. This was in the face of her already working only 1.5 hours per day.

54.     On January 10, 2020, Plaintiff was also prevented from entering postal premises at the Centerville Post Office and was then escorted out by Postmaster Beaty and MPOO Steele who had run her and Shop Steward Jones back to their cars. MPOO Steele even threatened to call the police on Plaintiff. This is yet another example of hostility and retaliatory conduct on the part of management of Defendant against Plaintiff.

55.     Later in January 2020, Manager Rattley approached Plaintiff while she was at her assigned Post Office alleging that Plaintiff was trespassing because she was still at the Post Office 15 minutes after her shift.

56.     On information and belief, no other postal service employee within the Tallahassee area has been subject to this level of scrutiny and abuse set forth above including the repeated abuse of the emergency placement system which Plaintiff fought for several years.

57.     Each incident of the incidents of unjust reprimand, suspension, and emergency placement is an indication of the disparate treatment and retaliation that Plaintiff was subjected to uniquely because she is a black female over the age of 58 which a disability or perceived disability and/or because she filed EEO charges.

18

58.     Further, Plaintiff is aware that Defendant had a pattern and practice of swiftly reprimanding and/or issuing Notices of Removal to black employees. In that same vein, Defendant had a pattern and practice of sluggishly or even failing to reprimand white employees for behaviors that otherwise would warrant emergency placement or termination. In the 22 years that Plaintiff has worked for the Defendant, only one white Letter Carrier at Plaintiff's location received a Notice of Removal. As of the filing of this action, Plaintiff continues to be employed with Defendant working only 1.5 hours per day.

59.     Plaintiff has retained the undersigned to represent her interests in this cause and is obligated to pay a fee for these services.  Defendant should be made to pay said fee under the statutes referenced above.

## COUNT I
## RACE DISCRIMINATION

60.     Paragraphs 1 through 59 are re-alleged and incorporated herein by reference.

61.     This is an action against Defendant for discrimination based upon race brought under 42 U.S.C. §2000e et seq. and 42 U.S.C. §1981.

62.     Plaintiff has been the victim of discrimination on the basis of her race in that she was treated differently than similarly situated white employees of

Defendant and has been subject to hostility and poor treatment on the basis, at least in part, of her race.

63.     Defendant is liable for the differential treatment and hostility towards Plaintiff because it controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.

64.     Furthermore, Defendant knowingly condoned and ratified the differential treatment of Plaintiff as more fully set forth above because it allowed the differential treatment and participated in same.

65.     Defendant's known allowance and ratification of these actions and inactions created, perpetuated and facilitated an abusive and offensive work environment within the meaning of the statutes referenced above.

66.     In essence, the actions of agents of Defendant, which were each condoned and ratified by Defendant, were of a race-based nature and in violation of the laws set forth herein.

67.     The discrimination complained of herein affected a term, condition, or privilege of Plaintiff's continued employment with Defendant.

68.     The events set forth herein led, at least in part, to the adverse actions against Plaintiff set forth above.

69.     Defendant's   conduct   and   omissions   constitutes   intentional discrimination and unlawful employment practices based upon race in violation of 42 U.S.C. §1981 and 42 U.S.C. §2000e et seq..

70.     As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits.  These damages have occurred in the past, are permanent and continuing.  Plaintiff is entitled to injunctive relief.

**COUNT II**
**DISABILITY DISCRIMINATION**

71.     Paragraphs 1 through 59 above are re-alleged and incorporated herein.

72.     This count sets forth a claim for discrimination on the basis of Plaintiff's actual or perceived mental or physical disability and/ or record of impairment.

73.     Plaintiff has been a victim of discrimination on the basis of actual or perceived disability and/or record of impairment. During the course of Plaintiff's employment by Defendant, Plaintiff was treated differently than similarly situated employees who are non-disabled, not perceived as disabled, or do not have a comparable record of impairment to Plaintiff.

21

74.     Defendant is liable for the differential treatment and its refusal to accommodate Plaintiff and engage in the interactive process with her, which adversely affected a term, condition, or privilege of Plaintiff's employment with Defendant as those terms are used in the applicable statutes.

75.     Defendant controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.

76.     In essence, the actions of agents of Defendant, which were each condoned and/or ratified by Defendant, were disability/perceived disability-based and in violation of the laws set forth herein.

77.     The discrimination complained of herein affected terms, conditions, and privileges of Plaintiff's continued employment by Defendant. The events set forth herein led, at least in part, to Plaintiff's removal from the workplace on several occasions and the prevention of Plaintiff's return to work on facetious pretenses of protecting her health despite repeated notice to the Defendant from Plaintiff's physician regard her capacity and ability to work through several CA-17 documents.

78.     Defendant's acts and omissions constituted intentional discrimination and unlawful employment practices based upon disability or perceived disability, under the laws cited herein.

22

79.     As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits. These damages have occurred in the past, are occurring at present, and likely will continue into the future. Plaintiff is entitled to equitable/injunctive relief under this count.

## COUNT III
## AGE DISCRIMINATION

80.     Paragraphs 1 through 59 are hereby re-alleged and re-incorporated as if set forth in full herein.

81.     This is an action against Defendant for discrimination based upon age brought under 29 U.S.C. §629 et seq.

82.     Plaintiff has been the victim of discrimination on the basis of her age in that she was treated differently than similarly situated younger employees of Defendant and has been subject to hostility and poor treatment on the basis, at least in part, of Plaintiff's age.  At least one comment was made about Plaintiff as set forth above regarding her ability to perform her job duties due to her age.

83.     Defendant is liable for the differential treatment and hostility towards Plaintiff because it controlled the actions and inactions of the persons making

decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.   Furthermore, Defendant knowingly condoned and ratified the differential treatment of Plaintiff as more fully set forth above because it allowed the differential treatment and participated in same. Defendant's known allowance and ratification of these actions and inactions actions created, perpetuated and facilitated an abusive and offensive work environment within the meaning of the statutes referenced above.

84.    In essence, the actions of agents of Defendant, which were each condoned and ratified by Defendant, were of an age-based nature and in violation of the laws set forth herein.

85.    The discrimination complained of herein affected a term, condition, or privilege of Plaintiff's continued employment with Defendant.  The events set forth herein lead, at least in part, to adverse action against Plaintiff.

86.    Defendant's   conduct   and   omissions   constitutes   intentional discrimination and unlawful employment practices based upon age in violation of the 29 U.S.C. §621 et seq.

87.    As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of

enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits.  These damages have occurred in the past, are permanent and continuing.  Plaintiff is entitled to injunctive relief.

## COUNT IV
## RETALIATION

88.     Paragraphs 1 through 59 are re-alleged incorporated herein by reference.

89.     This is an action against Defendant for unlawful retaliation after Plaintiff reported unlawful employment practices adversely affecting her.

90.     Defendant is an employer as that term is used under the applicable statutes referenced above.

91.     The foregoing unlawful actions by Defendant were purposeful.

92.     Plaintiff voiced opposition to unlawful employment practices during her employment with Defendant and has been the victim of retaliation thereafter.

93.     The events set forth herein have led, at least in part, to adverse actions against Plaintiff.

94.     Plaintiff is a member of a protected class because she reported unlawful employment practices and has been the victim of retaliation thereafter.  There is thus a causal connection between the reporting of the unlawful employment practices and the adverse employment action taken thereafter.

95.    As a direct and proximate result of the foregoing unlawful acts and omissions, Plaintiff has suffered mental anguish, emotional distress, expense, loss of benefits, embarrassment, humiliation, damage to reputation, illness, lost wages, lost opportunities, loss of capacity for the enjoyment of life, and other tangible and intangible damages.  These damages are continuing and are permanent.  Plaintiff is entitled to injunctive/equitable relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant for the following:

(a)    that process issue and this Court take jurisdiction over this case;

(b)    that this Court grant equitable relief against Defendant under the applicable counts set forth above, mandating Defendant's obedience to the laws enumerated herein and providing other equitable relief to Plaintiff;

(c)    enter judgment against Defendant and for Plaintiff awarding all legally-available general and compensatory damages and economic loss to Plaintiff from Defendant for Defendant's violations of law enumerated herein;

(d)     enter judgment against Defendant and for Plaintiff permanently enjoining Defendant from future violations of law enumerated herein;

(e)     enter judgment against Defendant and for Plaintiff awarding Plaintiff attorney's fees and costs;

(f)     award Plaintiff interest where appropriate; and

(g)     grant such other further relief as being just and proper under the circumstances.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury on all issues herein that are so triable.

Dated this 4th day of May, 2021.

Respectfully submitted,

/s/ Marie A. Mattox
Marie A. Mattox [FBN 0739685]
MARIE A. MATTOX, P.A.
203 North Gadsden Street
Tallahassee, FL 32301
Telephone:  (850) 383-4800
Facsimile:   (850) 383-4801

ATTORNEYS FOR PLAINTIFF